*In re* MARRIAGE OF CARL DURANTE, Petitioner-Appellee, and MAU-
REEN DURANTE, Respondent-Appellant.

First District (2nd Division)   No. 1—89—0917

Opinion filed June 29, 1990.—Rehearing denied July 31, 1990.

Eugene Lieberman and Marlene Schwartz Rothbardt, both of Wilmette, for appellant.

Harris & Goldstein, Ltd., of Chicago, for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

Respondent Maureen Durante (Maureen) seeks review of a por-

tion of the circuit court's judgment of the dissolution of her marriage to petitioner Carl Durante (Carl). She appeals from that portion of the judgment which distributed marital and nonmarital property and barred maintenance support. The issues presented are whether: (1) Maureen rebutted the presumption of a gift which arose from the placing of title to nonmarital property in joint tenancy; (2) the circuit court erred in barring Maureen from receiving or seeking maintenance and in failing to give adequate consideration to her contribution as a homemaker; (3) the circuit court gave adequate consideration to Maureen's gifts to the children from her nonmarital funds; and (4) the circuit court properly considered Carl's attempt to dissipate assets and income in apportioning the marital assets.

Carl and Maureen were married on August 18, 1956, and were the parents of two daughters who are now adults. At the time of dissolution, they were 54 years of age, and they had lived together in excess of 30 years.

At the time of dissolution, Carl was employed as a carpenter. Based on wages of $19.25 per hour, his 1987 tax return reflected a gross income of $39,039, which was the highest income he had earned during the marriage. Maureen, a homemaker who had cared for the children, did baby sitting and worked occasionally during summers and Christmas holidays at various retail stores.

Carl testified that he and Maureen were both in good health. Maureen testified that she had "middle age medical problems" which included bladder difficulty, hoarseness, breast cysts, cystic disease, and asthma; she was on medication for estrogen replacement and for a hive condition. She testified that her current physical condition would allow her to work part time in employment which did not require her to be on her feet.

In August 1960, the parties moved into a new home which Carl had built on vacant property in Northbrook, Illinois. The property had been purchased with money given to them by Maureen's parents for that purpose. The parties stipulated that the home was worth $160,000 to $165,000 at the time of dissolution and that the mortgage had been paid.

In 1978 the parties acquired a one-half interest in a multi-apartment building located in Palatine, Illinois. The other half was held jointly by Carl's parents. The building, subject to two mortgage liens totalling $165,000, was valued at $375,000 to $395,000. Although in their pretrial memoranda both parties classified the building as a marital asset, during the trial the parties disagreed as to whether the building was marital property. Maureen contended that Carl with-

drew $15,000 from a marital account containing $30,000, that she gave him $2,300 to purchase the property, and that she used the remaining $15,000 from the account to pay for various trips and vacations which she took with her daughters. Carl maintained that both parties agreed to equally split the $30,000; he took his portion, plus $8,000 earned from side jobs, and borrowed $2,300 from Maureen to purchase his half of the building. On the cashier's check for the $2,300, Maureen had written, "My loan to Carl for downpayment on his building." Carl maintained and repaired the building, and Maureen has never seen it. The rental income of the building paid all its expenses.

In 1981, Maureen's parents died. As a part of her inheritance, Maureen received a half interest in her parents' home located in Wilmette, Illinois; the other half went to her sister. At that time, the house was valued at $129,000. When Maureen purchased the other half of the house from her sister, using $64,500 of the money from her inherited nonmarital funds, the Wilmette property was conveyed by Maureen and her sister to Carl and Maureen, as joint tenants with rights of survivorship. In 1982, the parties moved into the Wilmette residence and Carl's mother and stepfather moved into the Northbrook house, pursuant to an agreement between the parties. At the time of dissolution, the Wilmette house was valued at $270,000.

Upon his death, Maureen's father, Eugene F. Galin, left her a share in a trust worth $73,000, payable upon her 55th birthday in January 1989; $7,408 in an IRA account; and cash, stocks, bonds, and other securities in another trust valued at $422,721. Maureen's income from this nonmarital property in 1987 was $13,432 from interest; $10,312 in dividends; and $12,765 in capital gains from stock sales.

Carl inherited $15,000 from the estate of Maureen's father. These funds were deposited into a joint checking account in the names of both parties at Horizon Federal Savings. At the time the parties separated, there was $4,652.90 remaining in the account.

In September 1986, while Maureen and their daughters were vacationing in Europe, Carl moved back into the Northbrook house and withdrew the $4,652.90 from the joint account at Horizon. Later, his mother closed out a bank account which she held jointly with him at Great American Federal Savings. Additionally, Carl had $8,000 in cash which he kept in a drawer of his dresser.

The judgment for dissolution set the value of the various properties, classified them, and distributed them in the following manner:

| Item | Value | Classification | Carl | Maureen |
|------|-------|----------------|------|---------|
| Wilmette home | $270,000 | marital | 25% | 75% |
| Northbrook home | $160,000 | marital | 50% | 50% |
| 1/2 Palatine unit | $91,500 | marital | 75% | 25% |
| Horizon Account | $4,652 | marital | 50% | 50% |
| Funds in drawer | $8,000 | marital | 50% | 50% |
| Stock | $2,325 | marital | 50% | 50% |
| Pension Fund | | marital | 51.48% | 48.52% |
| Insurance Policy | $3,046.50 | | 100% | |
| Insurance Policy | $2,177.08 | | | 100% |
| 1984 Chevrolet | $3,837.50 | marital | 100% | |
| 1980 Oldsmobile | $3,900 | marital | | 100% |
| IRA | $3,193.33 | marital | 100% | |
| IRA | $3,547.63 | marital | | 100% |
| Galvin Trust | $422,721 | nonmarital | | 100% |
| IRA | $7,408 | nonmarital | | 100% |

The circuit court also ordered that the parties were forever barred from seeking or receiving maintenance from each other. Maureen appeals from that portion of the circuit court's judgment relating to property distribution and permanent denial of maintenance.

## I

Maureen maintains that the circuit court erred when it deter-. mined that she had not rebutted the presumption of a gift to the marital estate of the Wilmette home, and when it failed to consider and account for her contribution of funds to the property which it should have balanced against all other factors listed in section 503 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1987, ch. 40, par. 503).

■■ ■ Prior to assigning or dividing property upon dissolution of marriage under section 503 of the Act, the court must classify it as either marital or nonmarital. Normally, property acquired by either spouse after the marriage prior to the judgment of dissolution is presumed marital property regardless of how title is held. (Ill. Rev. Stat. 1987, ch. 40, par. 503(b); *In re Marriage of Rogers* (1981), 85 Ill. 2d 217, 422 N.E.2d 635.) Property obtained by gift, legacy, or descent, however, is excepted from marital property and is classified as nonmarital property. (Ill. Rev. Stat. 1987, ch. 40, par. 503(a)(1).) Thus, the property received by Maureen upon the death of her father falls within the exception and was properly classified as nonmarital. As the circuit court correctly determined, however, once the Wilmette home

was transferred to Carl and Maureen in joint tenancy, a presumption of transmutation and of gift to the marital estate arose. (Ill. Rev. Stat. 1987, ch. 40, par. 503(b); *Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 429 N.E.2d 465, *cert. denied* (1982), 456 U.S. 905, 72 L. Ed. 2d 162, 102 S. Ct. 1751.) That presumption could be rebutted only by clear and convincing evidence. (*In re Marriage of Benz* (1988), 165 Ill. App. 3d 273, 518 N.E.2d 1316, citing *In re Marriage of Rink* (1985), 136 Ill. App. 3d 252, 257, 483 N.E.2d 316.) The issue, then, is whether Maureen presented evidence sufficient to rebut the presumption. *In re Marriage of Rogers*, 85 Ill. 2d at 223.

■ The testimony of both parties was that they intended to occupy the home in Wilmette as their marital residence and that the transfer to joint tenancy was consistent with how they held their other property during their marriage. Maureen testified that she expected the home to stay in the family and never intended it to be a gift. However, similar testimony has been considered insufficient to rebut the presumption of transmutation. (See *In re Marriage of Flemming* (1986), 143 Ill. App. 3d 592, 493 N.E.2d 666; *In re Marriage of Humphrey* (1981), 101 Ill. App. 3d 1134, 428 N.E.2d 1116.) Moreover, it is the circuit court's function to resolve conflicting testimony by assessing the credibility of witnesses and the weight to be accorded to their testimony. A court's finding will not be disturbed unless it is against the manifest weight of the evidence. *In re Marriage of Benz*, 165 Ill. App. 3d 273, 518 N.E.2d 1316.

■ The circuit court's decision that Maureen had not rebutted the presumption of gift to the marital estate did not constitute an abuse of discretion nor was it against the manifest weight of the evidence. The record reflects that, from the time she received her inheritance, Maureen contributed some amounts to the marital estate and kept other amounts. Maureen failed to exhibit a clear intent to keep the Wilmette house separate; on the contrary, she testified that holding property jointly was what they had always done.

■ Maureen alternatively asserts that the nonmarital property she invested in the marital home should be returned to her in recognition of her contribution. (*In re Marriage of Preston* (1980), 81 Ill. App. 3d 672, 678, 402 N.E.2d 332.) Contrary to Maureen's assertions, however, reimbursement for contributions is not mandated when property is given as a gift to the marital estate. Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(2); *In re Marriage of Mayzner* (1986), 144 Ill. App. 3d 645, 494 N.E.2d 615; *In re Marriage of Flemming*, 143 Ill. App. 3d 592, 493 N.E.2d 666.

## II

Maureen next argues that because of the uncertainty of her health and financial status and because she will be forced to deplete her assets, this court should reverse the circuit court's judgment which barred her from ever seeking maintenance. She further asserts that the circuit court erred in failing to consider her contribution as a homemaker and to reimburse her for that contribution.

■■■ The circuit court has broad discretion under the Act (Ill. Rev. Stat. 1987, ch. 40, par. 503(d)) to apportion marital property in "just proportions;" and that discretion is abused only when no reasonable person would take the view adopted by the court. (*In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 971, 441 N.E.2d 336.) While the circuit court must consider all relevant factors under section 503(d) of the Act, it need not make a specific finding as to each relevant factor. (*In re Marriage of Benz*, 165 Ill. App. 3d 273, 518 N.E.2d 1316.) When distributing property, courts should seek a high degree of finality so that parties can plan their future with certainty and need not return repeatedly to the courts. (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 459, 426 N.E.2d 1087.) A larger property division, as opposed to maintenance, is the preferred method of reimbursing a spouse for such things as nonmonetary contributions and contributions of capital. *In re Marriage of Legge* (1982), 111 Ill. App. 3d 198, 443 N.E.2d 1189, citing Ill. Rev. Stat. 1981, ch. 40, par. 504(a).

■ ■ Section 504 of the Act provides that an award of maintenance is appropriate if the spouse lacks sufficient property to provide for reasonable needs, is unable to self-support through appropriate employment, or is otherwise without sufficient income. (Ill. Rev. Stat. 1987, ch. 40, pars. 504(a)(1), (a)(2), (a)(3).) The value of a spouse's nonmarital property must be considered in determining any maintenance award. (*Bentley v. Bentley* (1981), 84 Ill. 2d 97, 101, 417 N.E.2d 1309; see Ill. Rev. Stat. 1987, ch. 40, par. 504(b).) Determination of the necessity for maintenance is within the circuit court's discretion, and the court's ruling will not be reversed unless it is contrary to the manifest weight of the evidence. *In re Marriage of Bentivenga*, 109 Ill. App. 3d at 972.

■■ If maintenance is appropriate, the amount and duration are determined pursuant to the factors set forth in section 504(b) of the Act. (Ill. Rev. Stat. 1987, ch. 40, par. 504(b).) However, the factors listed in section 504(b) and the cases relied upon by Maureen which explain those factors (see, *e.g., In re Marriage of Rothbardt* (1981), 99 Ill. App. 3d 561, 425 N.E.2d 1146; *In re Marriage of Carney* (1984),

122 Ill. App. 3d 705, 462 N.E.2d 596) are not relevant to the case at bar. That is so because the record shows that the circuit court did not err in concluding that Maureen had sufficient income from other sources, thereby negating the necessity of maintenance.

Prior to Maureen's inheritance, the parties lived on Carl's income. Following her inheritance in 1981, Maureen segregated a great portion of her income from the marital estate and used some of it for vacations with her daughters or gifts for them. Maureen's 1987 income of $36,509 was almost equal to Carl's earnings, albeit a portion of it, $12,765, was from the sale of stock. Nevertheless, without the sale, Maureen would have earned $23,744, an amount not plainly inadequate for her support. (See *In re Marriage of Bentivenga*, 109 Ill. App. 3d 967, 441 N.E.2d 336.) Although the spouse seeking maintenance is not required to sell assets or impair capital in order to be maintained in the manner established during the marriage (*In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1088, 412 N.E.2d 1336), the record is devoid of any evidence which supports Maureen's assertions that she must delve into the principal to meet her expenses, other than her testimony concerning that likelihood.

Maureen contends that because she will have to pay $67,500 to Carl for his share of the Wilmette home, she will deplete her assets if she keeps that home. However, an evaluation of the marital assets awarded to each of the parties belies that contention. From a division of marital assets alone, Maureen should receive in excess of $40,000 plus the Wilmette home, which is mortgage free and was valued at $270,000 at the time of dissolution.

Maureen's nonmarital estate, composed of cash, stocks, and bonds totaling in excess of $420,000, plus the more than $40,000 referred to above, plus the $73,000 she was eligible to receive in January 1989, can yield an income which far exceeds her 1987 income. The portion of Carl's pension which was payable immediately, stocks, and insurance supplemented this amount. Maureen's expense affidavit indicated that she was spending $106.35 more each month than her income. The figures above show that any deficit will be more than remedied by her income. It cannot be said that the circuit court abused its discretion or ruled against the manifest weight of the evidence when it concluded that Maureen did not need maintenance. *In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126; *In re Marriage of Bentivenga*, 109 Ill. App. 3d 967, 441 N.E.2d 336.

Maureen also asserts that because of her lack of work experience and poor health, the circuit court erred when it forever barred her from seeking maintenance, for, by doing so, the court was engag-

ing in speculation about the future. Instead, she argues, the court should have reserved its decision. (*In re Marriage of Rothbardt*, 99 Ill. App. 3d 561, 425 N.E.2d 1146.) *Rothbardt* is inapposite to the instant case, however, because there the record clearly showed that the wife was not self-sufficient and required maintenance until she could practice law and earn income. In the instant case, there was no question concerning when Maureen would become self-sufficient because, based on the property distribution and her inherited estate, she was already self-sufficient.

The record shows that in fashioning the property distribution order, the circuit court carefully considered all relevant factors, including Maureen's contributions to the marital estate. Moreover, Maureen received one-half of Carl's pension pursuant to a qualified domestic relations order because, as the court recognized, she had contributed to the home and family unit while Carl worked outside the home for 26 years. The circuit court's judgment properly considered each spouse's needs and afforded both parties an adequate standard of living. We conclude that the judgment that the parties were forever barred from seeking maintenance was not an abuse of discretion and enables the parties to plan their futures with certainty (see *In re Marriage of Hellwig*, 100 Ill. App. 3d 452, 426 N.E.2d 1087), and to maintain themselves in the style established during the marriage without selling assets or impairing capital. See *In re Marriage of Bentivenga*, 109 Ill. App. 3d at 971.

### III

Maureen maintains that the circuit court erred in refusing testimony regarding her substantial gifts to her daughters from her nonmarital funds. Maureen's offer of proof established that she had given both daughters $20,000 as a down payment for their homes, $6,000 for IRAs, and $4,000 for their weddings. She argues that those payments totalling $60,000 from her nonmarital funds allowed the marital funds to remain larger.

While the funds were spent by Maureen during the course of the marriage, her nonmarital property made the gifts possible. There was no legal obligation for either Maureen or Carl to expend marital or nonmarital funds on behalf of their daughters for the reasons Maureen's nonmarital funds were expended, and we reject Maureen's invitation to stretch what she argues to be a moral obligation into a legal one. Evidence of the funds expended by Maureen was properly excluded by the circuit court.

## IV

Maureen avers that when the marital assets were apportioned, the circuit court failed to consider assets dissipated by Carl's transfer of money from a bank account jointly held by the parties, the closing of a bank account jointly held with his mother, and his misstatement of income.

It is not an acceptable practice for one spouse, in contemplation of dissolution of marriage, to dissipate marital assets. (*In re Marriage of Hellwig*, 100 Ill. App. 3d 452, 462, 426 N.E.2d 1087.) Pursuant to section 503(d)(1), the circuit court may consider such conduct and compensate the disadvantaged spouse when apportioning marital property (Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(1)), but an award of cash or property equal to half of the amount dissipated is not mandated. *In re Marriage of Hellwig*, 100 Ill. App. 3d 452, 464, 426 N.E.2d 1087.

Maureen fails to cite any authority to support her contention that Carl's conduct raises a "presumption" of concealment of assets. The circuit court properly considered the dissipated marital assets when it awarded Maureen 50% of the $4,652 which Carl had withdrawn from the joint bank account; 50% of the $8,000 Carl kept in a drawer; and none of the account formerly held in the names of Carl and his mother because that money was determined to be his mother's. Finally, though Carl listed his income in an affidavit as $34,954.56, he conceded on cross-examination that his true income was the $39,390 stated in his income tax return. There was no evidence to the contrary nor, from this evidence, any presumption of concealment.

For all the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN and BILANDIC, JJ., concur.